(Nos. 4457, 4458, 4459, 4460, 4461, 4462, 4463—Consolidated—■■■■

Rose Minnie Gray, Et Al, Minnie P. Aydt, Donald Linton, Et Al, Carolyn Sue Linton, Et Al, Rose Minnie Gray, Minnie P. Aydt, Et Al, Diana Gray, Et Al, Claimants, *vs.* State of Illinois, Respondent.

*Opinion filed January 12, 1954.*

R. Vance Hartke and Pyle and McCallister, Attorneys for Claimants.

Latham Castle, Attorney General; C. Arthur Nebel, Assistant Attorney General, for Respondent.

Tolson, C. J.

The cases involved in this opinion were consolidated by order of the Court, as they involve claims for damages resulting from a common disaster.

In Case No. 4457 the complaint, as amended, seeks damages in the amount of $15,000.00 for the wrongful death of Malcolm B. Gray for the benefit of his widow, Rose Minnie Gray, and daughter, Diana Gray.

In Case No. 4458 the complaint seeks damages in the amount of $2,500.00 for injuries received by Minnie P. Aydt, a passenger in the car. The claim for damages was later increased to $7,500.00.

In Case No. 4459 the complaint seeks damages in

the amount of $2,500.00 for injuries received by Donald Linton, a minor, who was a passenger in the car.

In Case No. 4460 the complaint seeks damages in the amount of $2,500.00 for injuries received by Carolyn Sue Linton, a minor, who was a passenger in the car.

In Case No. 4461 the complaint seeks damages in the amount of $2,500.00 for injuries received by Rose Minnie Gray, who was a passenger in the car. The claim was later increased to $7,500.00.

In Case No. 4462 the complaint seeks damages in the amount of $15,000.00 for the wrongful death of Violet Hengstenberg for the benefit of Minnie P. Aydt, her mother, and Rose Minnie Gray, her sister.

Case No. 4463 was dismissed by agreement of the parties.

The record consists of the several complaints, as amended, answer of respondent, transcript of evidence, numerous motions and orders, brief of claimants, brief of respondent, and commissioner's report.

The complaints in substance allege the following:

1. That the State of Illinois failed to erect flasher signal lights on the temporary bridge;

2. That the State of Illinois failed to erect reflector warning signs;

3. That the State of Illinois failed to provide a watchman to warn automobiles of the dangers of the bridge;

4. That the State of Illinois negligently installed wooden runways on the bridge;

5. That the State of Illinois negligently failed to prevent the bridge road bed from becoming slick and slippery;

6. That the State of Illinois negligently permitted plaintiffs to use said bridge with knowledge that the bridge was unsafe and unfit for travel;

7. That the State of Illinois negligently constructed said bridge;

8. That the State of Illinois was negligent in inspecting said bridge.

The respondent interposed several defenses, which may be summarized as follows:

1. That the State was not negligent in any manner, as charged;

2. That all passengers in the car were engaged in a joint adventure, and that the driver of the car was negligent, thereby barring all claims.

3. That in Cases Nos. 4457 and 4462 the claims are barred by the Statute of Limitations, as the original complaint did not state a cause of action, and the amended complaint was not filed within a year of the date of death.

4. That the insurance company of the general contractor has paid the sum of $4,500.00 for a covenant not to sue, and that such payment inures to the respondent in the event any award is made.

The facts in these cases are as follows:

On June 30, 1950, Arnold Hengstenberg, Violet Hengstenberg, Donald Linton, Malcolm Gray, Rose Minnie Gray, Minnie Aydt and Carolyn Sue Linton left their home in Evansville, Indiana to drive to Bloomington, California to visit a relative. All in the party were closely related to one another. It is significant to note at this point that they crossed the bridge in question on their way going west.

On their return trip, they left an undisclosed point in the State of Kansas at 3 A.M. Arnold Hengstenberg and Malcolm Gray alternated at the wheel, and they arrived at a truck stop in Carmi, Illinois shortly before midnight. They had been driving constantly for twenty-one hours.

Three of the seven stopped for coffee, and, upon returning to the car, Arnold, also known as Bill, Hengstenberg took the wheel. His wife, Violet, sat at his right, and Donald Linton sat next to the right front door. In the back seat, the passengers were seated left to right as follows: Malcolm Gray, Rose Minnie Gray, Minnie Aydt and Carolyn Sue Linton. As the car was crossing the bridge, it went out of control, crashed through the guard rail, and fell 35 to 40 feet into the Little Wabash River. Arnold Hengstenberg, Violet Hengstenberg and Malcolm Gray were killed, and the other four passengers received serious injuries.

Since the temporary bridge is the focal point of the alleged negligence, the Court believes it necessary

to set out in length the nature of its construction. The Little Wabash River flows through the City of Carmi, Illinois in a southerly direction. In September of 1949 construction of a new bridge was started to carry the travel of Routes Nos. 1 and 460. A temporary bridge was built one block south of the regular bridge site. The temporary bridge was 493 feet in length, 24 feet in width, accommodating two lanes of vehicular travel; and, in addition, had a sidewalk 4 feet 4 inches wide on the north side for pedestrians. There were four runways extending the length of the bridge, each 30 inches wide, and built of two by tens, with the edges beveled down to one eighth of an inch. At the extremities of the roadway portion of the bridge were hubguards built of 8 inch timbers. The guard rail was built of 2 by 6 lumber bolted to 4 by 6 posts set 6 feet apart. The bridge had 3 lights, one at each end, and one in the middle.

The approaches to the bridge on the land side had received an application of calcium chloride to hold down the dust, which caused moisture to collect, and thereby made the wooden bridge floor slippery. To counteract this, the State applied a coating of hot asphalt and coarse sand to the runways to prevent the surface from becoming slippery, and it appears from the evidence that from tests made it was possible to stop a car travelling 30 miles per hour without skidding.

In the city of Carmi, Illinois, the State erected a series of 7 signs re-routing travel on Routes Nos. 1 and 460 across the temporary bridge. The last two signs are worthy of special mention. A 2 foot by 2 foot "slow" sign was erected 365 feet west of the approach to the west end of the bridge, and a 2 foot by 2 foot

reflectorized sign "speed limit 15 miles per hour" was erected 85 feet from the west end of the bridge. Both of these signs were lighted by flares placed in front of them.

The final road condition that may well have been the proximate cause of the accident was the slippery surface of the roadway. The accident occurred at about 12:05 A.M. on the morning of July 14, 1950. At certain times of the summer "willow bugs" hatch at night, and live for just a few hours. The bridge was covered with countless thousands of them, and their bodies created such a slippery condition that State Police Officers found it difficult to walk across the bridge without slipping. By the same token, it is understandable that the roadway was similarly as slippery.

Returning to the record, the speed of the car driven by Arnold Hengstenberg is in dispute. Mrs. Aydt, who was seated in the middle of the back seat, testified that he was driving "not very fast, he was driving very slow". She also stated that she was not in a position to see the road, and did not observe any of the signs heretofore mentioned.

Clarence Robinson, a State Police Officer, in answer to a hypothetical question, testified that in his opinion the car was being driven at a speed of not less than 30 miles per hour.

The evidence itself discloses the following: The car was driven in an easterly direction in the south lane of travel. It began to zig-zag, and crossed over the north lane. It jumped a hub rail of 3 inches, a water pipe of 3 inches; it crossed the 4 foot sidewalk, knocked down at least one 4 by 6 post, and thereafter fell in the river. This mute evidence establishes beyond

doubt that the car was being driven faster than the posted speed limit of 15 miles per hour.

Complainants have not established by the evidence, or the authorities, that it is the duty of the State to erect flasher lights, or provide watchmen; nor have complainants shown that the State was negligent in the construction, operation or inspection of the said bridge.

To the contrary, the State has shown by the testimony of several engineers that the temporary bridge was constructed according to standard engineering principles, and was built to sustain two twenty ton highway trucks passing on the opposite lanes at the same time; and, in fact, the bridge had been inspected by State Engineers the day before the accident in question.

The law in Illinois is well settled regarding the duty of the State in the maintenance of its highways.

"The State is not an insurer of all accidents that may occur by reason of the condition of its highways. *Beenes* vs. *State*, No. 4377, opinion filed on October 5, 1951.

However, the State is negligent, if, having knowledge of dangerous conditions on its highways, it fails to warn users of the highways of such dangerous conditions. *Pomprowitz* vs. *State*, 16 C.C.R. 230; *Rickelman* vs. *State*, 19 C.C.R. 54; *Rommel* vs. *State*, No. 4306, opinion filed on February 9, 1951; *Cruger* vs. *State*, No. 4271, opinion filed on October 13, 1950, Cf: *Mowery* vs. *City of Mounds*, 245 Ill. App. 338."

By posting warning signs that were adequately lighted, and treating the roadbed to prevent it from becoming slippery, the State has completely discharged its duty to build and maintain the roadbed in a reasonably safe condition.

The charge that the State failed to keep the roadbed from becoming slippery presents an unusual fact situation. As has been pointed out, the State coated the roadbed with hot asphalt and coarse sand for the

particular purpose of furnishing a rough driving surface. However, the benefits were lost due to the phenomena of nature when the hatch of "willow bugs" coated the bridge in such quantities that it was impossible to walk on the bridge without slipping.

An "Act of God" is defined as follows: *Words and Phrases*, page 170:

"Act of God". "Extraordinary floods, storms of unusual violence, sudden tempests, severe frosts, great draughts, lightning, earth quakes, sudden death and illness, have been held "Acts of God", citing *American Locomotive Co.* vs. *Hoffman.*

An "Act of God" is in an event which could not happen by the intervention of man. *Indiana I. & I. Railroad* vs. *Hawkins*, 81 Ill. App. 570."

In the instant case, the bug hatch was an "Act of God". It came in the night time without warning, and lasted for but a few hours. The State did not have knowledge, actual or constructive, of this condition. To hold that the State should have anticipated this danger, and prepared for this short lived emergency, would be to hold the State a virtual insurer of all accidents.

The remaining charge that the State failed to build guard rails of sufficient strength is contrary to established law.

"Where an automobile has gotten out of control of the driver, and goes through a barrier, it is usually held that such accidents are so unusual that there is no duty imposed to erect such a barrier as would have prevented the automobile from leaving the highway." 27 A.L.R. 342, *Brigla* vs. *St. Paul*, 134 Minn. 99.

Summarizing the evidence, the Court finds that the claimants were aware of the temporary bridge, as they had driven over it but a short while before the tragedy. The bridge was constructed according to sound engineering principles, and was maintained and inspected in a reasonable manner. The bridge was lighted. Warning signs were in place, and were lighted. The slippery condition of the roadbed was caused by

a phenomena, which could not reasonably have been anticipated by the State. The automobile was being driven at a speed in excess of 15 miles per hour.

For the reasons set forth, all claims must be denied.